```
                    UNITED STATES DISTRICT COURT

                        DISTRICT OF ARIZONA


Debra Duke,                     )
                                )
    Plaintiff,                  )
                                )   4:23-cv-125-RM-LCK
vs.                             )
                                )   Tucson, Arizona
American Express Company,       )   September 10, 2024
                                )   3:34 p.m.
    Defendant.                  )
_____)
```

**TRANSCRIPT OF PROCEEDINGS**
**MOTION HEARING**

BEFORE THE HONORABLE LYNNETTE C. KIMMINS
UNITED STATES MAGISTRATE JUDGE


APPEARANCES

For the Plaintiff (telephonically):

    Avi Kaufman
    Kaufman PA
    400 NW 26th Street
    Miami, Florida 33127

For the Defendant (telephonically):

    Stephen Newman
    Alice Kwak
    Steptoe & Johnson LLP - Los Angeles
    2029 Century Park East, 18th Floor
    Los Angeles, California 90067


Transcribed by:
    Anni Bryan
    (520)205-4268


Proceedings digitally recorded
Transcript prepared by transcriptionist

```
 1                    P R O C E E D I N G S
 2                            *  *  *
 3          (Hearing commences at 3:34 p.m.)
 4              THE CLERK:  Calling case number CV-23-125, Debra Duke
 5   versus American Express Company, on for a motion hearing.
 6         Counsel, please state your appearances.
 7              MR. KAUFMAN:  Good afternoon, Your Honor.  This is Avi
 8   Kaufman on behalf of Plaintiff Duke.
 9              THE COURT:  Thank you, Mr. Kaufman.  Good afternoon.
10              MR. NEWMAN:  Good afternoon, Your Honor.  Stephen
11   Newman for American Express.
12              THE COURT:  Thank you, Mr. Newman.
13         This is the time that the Court set this hearing for --
14              MS. KWAK:  Sorry, Your Honor.  I just want to get my
15   appearance in.
16              THE COURT:  Sure.  Go ahead.
17              MR. NEWMAN:  Sorry.  I was on mute.
18         This is Alice Kwak, also appearing on behalf of respondent.
19         Good afternoon.
20              THE COURT:  Good afternoon, Ms. Kwak.
21         Do we have anybody else on the line?
22         Sounds like no.
23         Good afternoon, everyone.  Let me introduce myself.  My
24   name is Lynnette Kimmins.  I'm a magistrate judge here in
25   Tucson.  We're here today on the plaintiff's motion to compel
```

1   discovery responses.
2       I have had an opportunity to review the motion, the
3   defense's response and also the plaintiff's reply.
4       Before we get started -- I will give the parties an
5   opportunity for the plaintiff to argue their motion and then,
6   obviously, for the defense to respond.  Before I do that, I
7   thought it might be beneficial -- I have some questions, so I
8   thought it might be helpful for all the parties if we went
9   through those questions first.
10      Before I do that, with respect to Mr. Kaufman, I do want to
11  just acknowledge I recognize it's after hours where you are, so
12  I appreciate you being available for today's hearing.  My
13  calendar this week was not flexible with respect to any type of
14  morning hearings, and my afternoon was pretty booked up as
15  well; but we wanted to make sure that we got the parties in for
16  the hearing.
17      Mr. Kaufman, I'm wondering if you can clarify for me what
18  the current class definition is or -- I believe it would match
19  the discovery request that was made after mediation, but I
20  wanted to make sure I was accurate in that.
21          MR. KAUFMAN:  So the class is defined in -- I think in
22  the complaint, as a starting point, was all persons for whom
23  defendant claims to have obtained prior express consent to call
24  in the same manner it claims to have obtained prior express
25  consent to call the plaintiff or from whom defendant did not

1   obtain prior express consent.
2       Discovery has confirmed that plaintiff is a non-account
3   holder from whom defendant never obtained consent.  So the
4   class that we're going to seek to certify is a slight
5   refinement on the class as defined in the initial complaint,
6   and it will be all persons who received a prerecorded call to
7   their cellular telephone number using an artificial voice or
8   prerecorded voice who are not account holders of defendant.
9   Because that is the circumstance that plaintiff finds herself
10  in, and that's who we'll seek to certify a class on behalf of.
11      The refined definition -- or I guess the refined request
12  for production through the defendant's letter that we've been
13  using and that we're seeking to compel will be a jumping-off
14  point for notice, although it won't be a complete proxy for
15  identifying class members.  It will be used to demonstrate
16  numerosity.
17      Defendants will have their arguments that even -- not every
18  person who identifies themselves as a wrong number is
19  necessarily a non-account holder, but that will be a question
20  for ascertaining class members as part of notice.  It will be
21  sufficient to demonstrate numerosity, and it will be a useful
22  tool for plaintiff's notice expert for identifying class
23  members down the line once a class is certified.
24          THE COURT:  So, then, for at least certification
25  purposes, you would be going forward with the definition that

1  was used -- the modified request that was used for mediation.
2  Is that correct?
3             MR. KAUFMAN:  So, yes, it will be persons who reflect
4  at least one -- so the class won't be defined to incorporate
5  the wrong party-never call notation because that would perhaps
6  be overinclusive, because the defendant will argue that there
7  are valid account holders who will claim that they are a wrong
8  party because they don't want to proceed in debt collection
9  calls that might otherwise be valid.
10     But while it doesn't directly mirror the class definition,
11  it will include all class members, even if not every person
12  that is included in the records is a class member.
13             THE COURT:  Okay.
14     And then, Mr. Newman and/or Ms. Kwak, I do have a question
15  with respect to recognizing that the action's been pending
16  since March of 2023, and it appears that Amex has not produced
17  basic discovery information.  I am curious as to why the
18  defense are objecting to producing at least the information
19  that was gathered for the mediation, which appears to be this
20  definition regarding the at least one instance of a wrong party
21  or never call notation that the plaintiffs have indicated.
22             MR. NEWMAN:  Happy to address that, Your Honor.
23     With the additional material Your Honor requested in
24  advance of this hearing, we included the letter that we had
25  provided to Mr. Kaufman in May of 2024, outlining the process

1   that Amex went through in advance of mediation.  And what
2   you'll see is that process was fairly extensive, but also that
3   we made it very clear that the information being gathered was
4   highly overinclusive and that, you know, if we were looking to
5   settle a case, we would be looking at a -- in many of these
6   cases, Your Honor, the way they are settled is because there --
7   in our view, there's really no way to, you know, get a perfect
8   class list.  In our view, the class list will be highly
9   imperfect.
10       So, for purposes of settlement, you find a fairly broad
11  universe that's highly overinclusive.  And then you have a
12  claims process, and you have parameters around that claims
13  process.  And the reason defendants do this is because they
14  want peace and they feel protected to some degree because,
15  ultimately, there's a claims process; and if there are nonclass
16  members who are trying to claim, there's a process to keep them
17  out and make sure that there's no -- no one is getting unjustly
18  rich through the settlement.
19       So the fact that we provided information for the purposes
20  of mediation doesn't necessarily mean that any of that is
21  discoverable for purposes of the litigation class.  And I
22  believe Mr. Kaufman would concede this because in his response
23  to Your Honor's question, I believe he admitted that what he
24  was seeking was overinclusive, that it would take information
25  from persons who are not class members, who aren't his clients,

1  that it's a useful tool to eventually find a class.  I think he
2  used the term that it's a "jumping off" point.
3      And that's not proper.  And the reason why it's not proper
4  is because he's asking American Express to look into the
5  records of its own customers who, by definition, are nonclass
6  members, to get into their personal information in an effort to
7  potentially find a class.  Now, that's the broad point.
8      Let me get to some of the specific points which I think
9  Your Honor should also take into account:
10     If Your Honor looks at our May 2, 2024, letter, you will
11 see that when we did the analysis -- when American Express did
12 the analysis -- and let me stress that it's not from -- it's
13 not like a situation in discovery where a party has -- you have
14 some business record, a letter, a document, that's already in
15 its possession and it produces it to the other side in
16 connection with mediation.
17     This was analysis that was specifically performed for the
18 mediation.  It wasn't taking a preexisting (indiscernible).  So
19 I am highly bothered that by entering into mediation in good
20 faith, there's now an effort to flip that good faith against us
21 and use it offensively to seek discovery that probably could
22 not have been undertaken in the absence of mediation.
23     But be that as it may, in the May 2nd letter, we identify,
24 for purposes of potential settlement, a group of 19,606, which
25 was hugely overbroad, because there was no notation -- you

1  know, at least nothing could be noted out of further
2  investigation to suggest that any of those 19,000 had received
3  a prerecorded voice phone call, which is an element of the
4  claim here.  There has to be a prerecorded artificial voice
5  call that's actually played, and it has to be heard by someone.
6  But, nonetheless, going into mediation, we proposed a broader
7  notice population, just in case there's a potential claim out
8  there that -- we're going to do a deal; let's make sure we pick
9  up everybody.
10       But we also identified a smaller population, a core
11  population, of 3,133.  And, you know, that -- you know, again,
12  subject to all the qualifications that people sometimes say
13  it's a wrong number when it's not; it only reflects an attempt
14  to play and don't know if it's actually heard; you don't know
15  what's happening on the receiving end; you don't know if
16  there's an answering machine; you don't know if there's voice
17  mail.  There's a million things you don't know.
18       So I would submit that, based on the description in
19  (indiscernible) presentation, they're seeking records
20  reflecting each attempt by Amex to play some prerecorded voice
21  call, that what we're really talking about is, you know, the
22  list of numbers from that 3,133 population.  And, in our view,
23  because there's no class system certified yet and you don't
24  know who these people are and there are potential privacy
25  interests involved, there's no entitlement to get that data at

1  this time.  And that's the reason we haven't produced it, Your
2  Honor.
3              THE COURT:  But the case has not been bifurcated.  We
4  specifically did not bifurcate the class certification from the
5  discovery processes, so there's still a duty on the defense to
6  provide information that is relevant and discoverable.
7      And my question to you was -- you already processed this
8  information for purposes of mediation, so my question was, why
9  are you not willing to disclose that information to the
10 plaintiff?  Because it's -- your argument to the Court on the
11 motion to compel was that this is going to take too much time;
12 it's going to take too much money; it's going to take too much
13 manpower.  But you already discovered this information for
14 purposes of mediation.  So the question is, why will you not
15 disclose that information to the plaintiff?
16             MR. NEWMAN:  Well, number one, it's not the class.
17 Inherently, it's not the class because there's no class yet.
18 Number two, there's a difference between framing the question
19 as how many fall within the set of this criteria and if the
20 question is, you know, have you found 3,000 people who maybe
21 there was an attempt to call.  That's a very different question
22 than, turn over more than 3,000 phone numbers of complete
23 strangers who have privacy interests.
24             THE COURT:  How is the plaintiff going to get anywhere
25 without Amex disclosing something?  And the idea is, let's

1  disclose something so we can move forward with this case,
2  whether it's a class certification or not.  And the easiest
3  thing that I think the plaintiffs were trying to say is, hey,
4  look, Amex has already done this initial legwork; why can't
5  they just disclose this to us first and let us get started?
6           MR. NEWMAN:  Well, again, as I said before, it, in
7  effect, is punishing us for entering into mediation in good
8  faith.  And, you know, what are -- what are they going to do
9  with those numbers?  They're going to start calling people?
10 Are they going to start calling people as an auto dialer and
11 say, you know, "We think your rights have been violated by
12 someone calling you as an auto dialer and playing a prerecorded
13 artifical voice"?
14          THE COURT:  Isn't that something that takes place
15 after the case is resolved and we get to a potential judgment?
16 I mean, I think what they need right now is information to get
17 at least enough information to know where they're going with a
18 class certification, if they can.  And I don't think the
19 plaintiffs at any point were going to start calling anybody.
20 They're just trying to get some information to see where they
21 are.
22          MR. NEWMAN:  Well, Your Honor, I would hope that if
23 Your Honor orders disclosure of the 3,100 -- or we did argue,
24 in the alternative, that one possibility is to take a sampling
25 of that population to minimize the burden and minimize the

```
 1   potential privacy impact.  I would hope Your Honor would impose
 2   some substantial limitations on the use of that information and
 3   would place some controls over what sort of contact could be
 4   made, because we certainly would not want willy-nilly calling
 5   or contact to people.  And if there is to be any communication,
 6   we would want the Court to make sure that that communication
 7   was focused on getting information as opposed to, you know,
 8   stirring up animus against American Express or suggesting that
 9   a claim exists when the claim might not exist.
10             THE COURT:  Let me stop you and ask Mr. Kaufman:
11   Mr. Kaufman, was there any, I guess, thought process at this
12   stage where you thought you would be calling these individuals
13   once you get this information?
14             MR. KAUFMAN:  Absolutely not, Your Honor.  In fact, we
15   suggested that if they have privacy concerns, they should be
16   more protected under the protective order.  We're not seeking
17   some type of improper use of the information.  We need the
18   information to make a showing at class certification that the
19   class should be certified.
20             THE COURT:  And, Mr. Newman, doesn't Amex have some
21   sort of coding system or a way to determine -- if Amex is
22   calling an individual and they are indicating that they're the
23   wrong party or they're never a -- that they're in the
24   never-call-me-again situation, there's got to be some sort of
25   system that Amex uses at some point to ultimately determine
```

1  they're not going to be calling this person anymore.  Correct?
2           MR. NEWMAN:  Well, I think to call it a system -- let
3  me explain what generally happens, and Your Honor can decide
4  whether that's a system or not.
5       Someone calls and the person who answers the phone says,
6  "Wrong number.  Don't call us ever again."  The caller is
7  supposed to notate that account in the system:  Don't call this
8  number anymore.  You're dealing with human beings who, despite
9  the best training, you know, they're not going to get it right
10 a hundred percent of the time.  But they try.  The policy is,
11 if someone says "don't call me ever again," don't call them
12 ever again.
13      However, what often happens in the future -- I don't know
14 how often, so I don't want to suggest any frequency.  But
15 sometimes what happens down the road is the card member will
16 call in from the number that was previously indicated to be the
17 wrong number, you know, because maybe they've -- they're in the
18 scenario where someone who doesn't want to pay their debt or
19 maybe they don't get the card member; they get someone else in
20 the house who isn't aware of the card or -- there's a million
21 reasons why someone might say it's not the right number and
22 that statement might be incorrect.
23      But if someone calls in, American Express can see what
24 phone number is being called in, and the training at that point
25 is, oh, I see you've called me from, you know, 867-5309, or

1   whatever the number is, is that your number?  And they say, oh,
2   yes.  So at that point the number can flip from being "don't
3   call us" to "it's okay to call again."  Also, sometimes people
4   will put in a notation, hey, don't call me at my work number
5   anymore.  And then something will change and they'll say, oh,
6   no, it's fine; you can call me at my work number.
7       People's preferences do change.  And the goal, certainly,
8   is to only have an asterisk number that's a wanted number where
9   outreach is going to be made, but it's not always simple to
10  know what that is.
11      Now, is that a system?  I mean, a system, to me, suggests
12  something that happens automatically without human interaction.
13  But this is a very human-dependent operation, both on the
14  receipt of instructions from the card member and the
15  implementation of those instructions by American Express, as
16  well as, in this case, the inevitable human error that arises
17  sometimes when people submit information to Amex in the first
18  instance about what their phone number is.  People make typos;
19  people, if they submit handwritten information, sometimes the
20  numbers can't be read properly.
21      But the goal is never to make an unwanted call or wrong
22  number call because every phone number that --
23          THE COURT:  Well, I understand that.
24      My question was, is there some sort of coding or process
25  that American Express has so that they know not to call that

1   person again?  Do you know what I mean?  There's got to be some
2   sort of code that American Express has that would be a process
3   that they could use for discovery, for instance, in this case,
4   to come up with the list of numbers and production that the
5   plaintiff is asking for.
6           MR. NEWMAN:  The problem, Your Honor, is that it is
7   maintained on an account-by-account basis.  So for each
8   account --
9           THE COURT:  Well, we are talking about phone numbers,
10  not accounts.  We're talking about phone numbers where the
11  individual says, "Wrong number.  Don't call me again."
12          MR. KAUFMAN:  Your Honor, this is --
13          THE COURT:  Go ahead, Mr. Kaufman.
14          MR. KAUFMAN:  Thank you, Your Honor.
15      So that's -- what Your Honor is referencing is the wrong
16  party-never call notation, which is precisely the analysis that
17  American Express conducted for the mediation and is precisely
18  the modified request for production that we're moving to compel
19  on.
20      So the system Your Honor is describing is that annotation.
21  What Mr. Newman is saying is that sometimes the annotation is
22  imperfect and sometimes the humans that are required to input
23  the annotation are imperfect.  But what Your Honor is getting
24  at is, is there a system?  Yes, there's a system.  They
25  annotate the records.  And American Express has already pulled

1   the records from the accounts that have been annotated that
2   have received prerecorded calls and identified 3,133 of them.
3   And what we're seeking to compel are those records to those
4   3,133 that have already been annotated pursuant to the system
5   for trying to avoid wrong-number calls.
6           THE COURT:  So you're not asking -- Mr. Kaufman,
7   you're not asking for the 19,606 phone numbers; you're asking
8   for the 3,000 numbers.  The 3,113 figure?
9           MR. KAUFMAN:  3,133, I believe, Your Honor.  Yes, our
10  request was limited to individuals who had that annotation and
11  to whom at least one artificial voice or prerecorded call was
12  attempted.  I think the distinction between the 19,000 number
13  and the 3,000 number is there's 16,000 people who had a wrong
14  number annotation to whom no prerecorded or artificial voice
15  calls were attempted, so they didn't receive an artifical voice
16  call or prerecorded call.  That's not relevant to the class.
17          THE COURT:  Mr. Newman, why can't Amex produce the
18  3,133 numbers?  Even though I recognize you think it overstates
19  the class size, why can't you do that if it's already been done
20  and that it's not going to cost you any more money, as you've
21  indicated in Mr. Sailer's affidavit?
22          MR. NEWMAN:  It would be for the privacy reasons that
23  we have asserted, as well as --
24          THE COURT:  But why can't you do a privilege log?
25  We've got the protective order.

1    MR. NEWMAN:  Yes.  If the question is, is it
2    physically possible to deliver the 3,133 phone numbers that
3    have been compiled subject to protective order, the answer to
4    that question is, yes, it is possible.
5         THE COURT:  So why are you objecting to it?
6         MR. NEWMAN:  For the privacy reasons we've stated and
7    because it overstates the class.
8         THE COURT:  And, Mr. Kaufman, if the Court orders Amex
9    to produce the 3,133 numbers, pursuant to a protective order,
10   would that satisfy your requests in the interrogatory and
11   production request --
12        MR. KAUFMAN:  Yes, Your Honor.  I think we're
13   seeking --
14        THE COURT:  -- at this juncture?
15        MR. KAUFMAN:  Yes, Your Honor.
16        THE COURT:  Anything further, Mr. Newman?
17        MR. NEWMAN:  Nothing, Your Honor.  Thank you for
18   allowing us the opportunity to explain the process we went
19   through and to allow this hearing today.
20        THE COURT:  Mr. Kaufman, anything else?
21        MR. KAUFMAN:  No.  Nothing additional, Your Honor.
22   Thank you.
23        THE COURT:  So based on the information provided by
24   the plaintiffs and defense, at this time, the Court is going to
25   order that American Express produce to the plaintiff the 3,133

Case 4:23-cv-00125-RM-LCK   Document 44   Filed 09/17/24   Page 17 of 18

17

| | |
|---|---|
| 1 | numbers and/or information related to that, subject to the |
| 2 | protective order. |
| 3 | Anything further, Mr. Kaufman? |
| 4 | Go ahead, Mr. Newman. |
| 5 | MR. NEWMAN:  I would ask that Your Honor also -- and, |
| 6 | again, I don't doubt that Mr. Kaufman will abide by this |
| 7 | because he said he would, but if Your Honor would please make |
| 8 | it clear that there should be no contact with those |
| 9 | individuals, absent further order of the record.  And we would |
| 10 | obviously discuss with Mr. Kaufman what, if anything, can be |
| 11 | done in the intermission, subject to the protective order. |
| 12 | THE COURT:  Certainly I'll do that. |
| 13 | Mr. Kaufman, the plaintiffs are prohibited from contacting |
| 14 | any of the individuals related to the 3,133 numbers, absent |
| 15 | discussion with defense and coming back to the Court for |
| 16 | appropriate rulings. |
| 17 | MR. KAUFMAN:  Understood, Your Honor. |
| 18 | THE COURT:  Anything further at this time, |
| 19 | Mr. Kaufman? |
| 20 | MR. KAUFMAN:  No, nothing additional. |
| 21 | THE COURT:  Mr. Newman? |
| 22 | MR. NEWMAN:  Nothing, Your Honor.  Thank you. |
| 23 | THE COURT:  Thank you. |
| 24 | Thank you, Ms. Kwak. |
| 25 | (Hearing adjourns at 4:02 p.m.) |

**C E R T I F I C A T E**

    I, Anni Bryan, court-approved transcriber, certify that the foregoing is a correct transcript from the official digital sound recording of the proceedings in the above-entitled matter to the best of my ability.

    Dated this 17th day of September 2024.

                          _____/s/Anni Bryan_____
                          Anni Bryan